IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:22-CV-00032-KDB-SCR

| | |
|---|---|
| ERWIN S. MINGO, | |
| Plaintiff, | |
| v. | **ORDER** |
| THE CITY OF MOORESVILLE, | |
| Defendant. | |

**THIS MATTER** is before the Court on Defendant Town of Mooresville's ("Mooresville")[1] Motion for Summary Judgment (Doc. No. 16). The Court has carefully considered this motion, including the parties' briefs and exhibits. For the reasons discussed below, the Court will **GRANT in part and DENY in part** the motion for summary judgment.

Plaintiff Erwin S. Mingo is a former Mooresville Police officer. Mingo has alleged that the Mooresville Police Department ("MPD") racially discriminated against him by subjecting him to frequent drug testing and by creating a hostile work environment. He also asserts that the MPD unlawfully retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Based on undisputed facts, the Court finds that a reasonable jury could not conclude that Mingo was racially discriminated against in the MPD drug testing program or that he was the victim of retaliation in violation of Title VII. Therefore, the Court will grant summary judgment for Defendant on those claims. However, and while it is a close question, the Court holds that there may be sufficient evidence from which a reasonable jury could determine

---

[1] Plaintiff has captioned its action against the "City" of Mooresville, rather than the "Town" of Mooresville. However, Defendant has not disputed the claims against it on this basis.

that Plaintiff was subjected to unlawful racial discrimination through a hostile work environment. Therefore, summary judgment will be denied on that portion of Mingo's claims.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff Mingo is an African American man who was hired by the MPD as a police officer in October 2015. Plaintiff first served as a MPD patrol officer on the night shift. Doc. No. 29-2 (p. 15). He moved to the day shift in September of 2018. Doc. No. 29-2 (p. 16). Mingo remained in that position until he resigned in April of 2020. Doc. No. 29-2 (p. 19).

3

The events at issue here took place from December 2017 to July 2019. In December 2017, Plaintiff was asked to be part of a MPD Honor Guard laying a wreath at a Confederate soldiers' monument as part of a "Wreaths Across America" program. Doc. No. 29-5 (p. 2). Mingo, the descendant of slaves, "expressed his reluctancy to participate," but he was not excused from the event. Doc. No. 29-5 (p. 2). Ultimately, Mingo participated, but his supervisors "resented Officer Mingo [for] allowing personal opinion to interfere with his performance of Departmental responsibilities." Doc. No. 29-5 (p. 2). In fact, Mooresville's Mayor, who had attended the event and was concerned that Mingo's reluctance to serve may have violated "white people rights," asked the MPD to investigate Mingo. Doc. 29-2 (p. 31, lines 17-22). Then-Captain Frank J. Falzone quickly obliged, opening an "investigation" regarding Mingo's behavior. Doc. No. 29-5. This inquiry was later closed following discussions between then-Chief Damon Williams and the Executive Command Staff. Doc. No. 29-5 (p. 3).

Six months later, in May 2018, Plaintiff filed his first EEOC Charge, No. 430-2018-02113. Doc. No. 29-6. In that complaint, Mingo asserted that the MPD had subjected him to disparate and racially discriminatory treatment throughout his employment. Doc. No. 29-6 (p. 2). He offered the just described events of December 2017 related to the confederate soldiers' memorial as an example. *See* Doc. No. 29-6 (p. 2). Mingo further alleged that continuing racial animosity and tension had created a hostile work environment. Doc. No. 29-6 (p. 2). The EEOC closed its file on the charge on October 1, 2018. Doc. No. 29-6 (p. 3).

On November 13, 2018, Plaintiff engaged in a verbal altercation with a supervising officer during a firearms in-service training. Doc. No. 29-7. He received a written reprimand from Captain Falzone regarding the incident on November 20, 2018. Doc. No. 29-7. Mingo alleges that similarly situated white officers did not receive any discipline. Doc. Nos. 29-3, 29-21.

4

As noted, Mingo also complains about the MPD drug testing program. All MPD officers are subject to drug testing, which is run by a third-party contractor named Nationwide Testing Association, Inc. ("NTA"). *See* Doc. No. 18 (p. 1-2). NTA randomly selects a group of MPD officers to be drug tested each quarter. Doc. No. 18 (p. 2). Of those selected, a subsection of that group is randomly selected for alcohol testing. Doc. No. 18 (p. 2). Plaintiff was first selected for random drug testing in the first calendar quarter of 2016. Doc. No. 18 (p. 4). He was next selected in the third calendar quarter of 2018, the fourth calendar quarter of 2018, and the first calendar quarter of 2019. Doc. No. 18 (p. 4). He was not selected again prior to leaving the MPD in April 2020. *See* Doc. No. 18. Mingo was never also randomly selected for alcohol testing during his drug testing. Doc. No. 18 (p. 4).

On January 18, 2019, Plaintiff went to speak with Defendant Mooresville's Human Resources Department ("HR"). Doc. No. 29-3. Mingo expressed concerns that he was being frequently selected for drug testing in retaliation for his prior EEOC Charge and stated that he considered it to be harassment. Doc. No. 29-3 (p. 7). The two HR representatives to whom he spoke assured him that the selection process for drug testing was entirely random and noted that several other people had previously come to HR to complain about being selected for drug testing. Doc. No. 29-3 (p. 7).

Subsequent to this meeting, HR Director Keli M. Greer filed a complaint with Chief Williams. Doc. No. 29-8 (p. 3). Ms. Greer complained that Mingo had been visibly upset, had been dressed in his full police uniform with all issued equipment, that his demeanor was aggressive and demanding, that he had been unprofessionally intimidating as a result of standing in the doorway of the HR office, that he had "glare[d] and stare[d]" at the HR staff, and that he had exited hurriedly, which caused him to hit a glass door as he was leaving the building. Doc. No. 29-8 (p.

5

3). For his part, Mingo said that he was directed to speak to HR by his supervisor while he was in uniform and on duty. Doc. No. 29-3 (p. 7). He confirmed making eye contact with the two women from HR, which he believed was appropriate, but said that he did not curse, slam any items, or restrict anyone's movements. Doc. Nos. 29-3 (p. 7), 29-9. Plaintiff explained that the door exiting the building requires people to push it with some force in order to get out, but said that he otherwise was not disruptive leaving the building. Doc. No. 29-3 (p. 8). On January 29, 2019, Major Eric Henderson, Plaintiff's supervisor, issued Mingo a written reprimand in response to Ms. Greer's complaint. Doc. No. 29-8. Mingo alleges that white officers were not similarly reprimanded for the same behavior. Doc. No. 29-3 (p.7).

On June 9, 2019, Mingo had his annual performance review. Doc. No. 29-10 (p. 2). He was informed by his supervisor that despite having otherwise earned an "Exceeds Expectation" rating, the supervisor's commanding officers had instructed the supervisor to add the written reprimand from January 2019 to Mingo's review. Doc. No. 29-10 (p. 2). This lowered Mingo's rating to "Meets Expectations," resulting in Mingo receiving a lower annual pay raise. Doc. No. 29-10 (p. 2). On July 8, 2019, Mingo filed his second EEOC Charge, No. 430-2019-02210, alleging that the drug testing program was not random, that he was subject to a hostile work environment, and that the MPD had retaliated against him because of his prior complaints of race discrimination and retaliation. *See* Doc. No. 29-10. As he had on his previous EEOC Charge, Mingo checked the box for "Continuing Action." Doc. Nos. 29-6 (p. 2), 29-10 (p. 2).

While Plaintiff's second EEOC Charge was pending, he filed a third EEOC Charge, No. 430-2020-00676, on December 13, 2019. Doc. No. 29-11. In that final charge, he alleged that the MPD had unfairly changed its promotion criteria, which created new requirements that were more favorable to white officers. Doc. No. 29-11 (p. 2). Specifically, the new policy required officers to

have been promoted to Corporal before applying to be a Sergeant. Doc. No. 29-11 (p. 2). All Corporals in the MPD at the time were white and were promoted, while African American officers with more experience were ranked at the bottom of list for promotions. *See* Doc. No. 29-11 (p. 3). Mingo stated that without this change, he would have been qualified to apply for the Sergeant position. Doc. No. 29-11 (p. 2). Despite seemingly being ranked number four on the Corporal's Promotion Eligibility List, Doc. No. 29-15 (p. 2), Mingo alleges that he was only offered a promotion to Corporal after 11 white officers declined the promotion. Doc. No. 29-11 (p. 3). Mingo ultimately declined the offered promotion because it would return him to the night shift, which, as the MPD knew, was no longer an option for him because of family time commitments. Doc. No. 29-11 (p. 3). In his third EEOC Charge, Mingo again checked the boxes for discrimination based on race, retaliation and "Continuing Action." Doc. No. 29-11 (p. 2).

Finally, Plaintiff alleges that by April 2020 he feared that he would be targeted for termination and so he resigned because he did not want his career in law enforcement to be negatively affected by being fired by the MPD. In his resignation letter, dated April 10, 2020, effective April 24, 2020, Mingo explained that he was resigning due to the "continuous racial disparities toward minorities and [him]self." Doc. No. 29-20. He noted that he was unwilling to "compromise [his] convictions as an African American male for the convenience of being a police officer." Doc. No. 29-20.

Plaintiff's third charge was closed by the EEOC on August 23, 2021. Doc. No. 29-16 (p. 2). Mingo's second charge was concluded on December 23, 2021. Doc. No. 29-10 (p. 3). Mingo timely filed this suit based on the second charge on March 22, 2022. Doc. No. 1. Following a full period for discovery (in which Plaintiff served only a request for production of documents and

7

took no depositions), Defendant has now moved for summary judgment on all of Mingo's claims. That motion has been fully briefed and is ripe for the Court's decision.

## III. DISCUSSION

Plaintiff Mingo asserts two claims. First, he alleges that the MPD engaged in racial discrimination by subjecting him to frequent drug testing and by creating a racially hostile work environment in violation of Title VII. Second, he alleges that the MPD engaged in unlawful retaliation in violation of Title VII after he complained about racism in the MPD and filed his EEOC Charges.

### A. Race Discrimination

Under Title VII, it is unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Plaintiffs can support their claims with either direct or indirect evidence of such discrimination, or if lacking such evidence, through the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (2005). Mingo has provided no concrete evidence of disparate treatment in the drug testing selection process so the Court will grant summary judgment on that claim. However, the Court will deny summary judgment on his second allegation because Mingo may have provided sufficient, direct evidence of a racially hostile work environment.

#### 1. Random Drug Testing

Plaintiff has alleged that, as an African American police officer, he was subject to more drug testing than his white counterparts. Doc. No. 1 (p. 2). As discussed above, all MPD officers

8

are subject to random drug testing, in a program run by NTA, a third-party contractor. Doc. No. 18 (pp. 1-2). Plaintiff was selected for random drug testing during four calendar quarters from the beginning of 2016 to the first calendar quarter of 2019, with the final three tests coming in consecutive quarters. Doc. No. 18 (p. 4). However, Mingo has provided no evidence that race played any part in his selection for drug testing.

Rather, although it is not required to do so, Defendant has provided affirmative evidence of the lack of discrimination in the drug testing program. Alesea Walton, the Assistant Office Manager of NTA testified by affidavit that NTA randomly selects individuals for testing by using a computer system. Doc. No. 18 (p. 2). Neither Defendant nor NTA employees have any input into whether a particular individual is selected for testing. Doc. No. 18 (p. 2). Furthermore, Walton testified that race is not a data field maintained by NTA for anyone in the testing pool, meaning the computer program that selects MPD officers for drug testing does not know their race and therefore cannot possibly take race into account when making its selections. Doc. No. 18 (p. 3). She concluded her testimony by confirming that Mingo was randomly selected, rather than purposefully targeted, for each of the drug tests he challenges. Doc. No. 18 (p. 4-5). Moreover, Defendant's current HR Director, Tiffany Shelley, testified that Defendant itself has no input on which names are selected by NTA's selection program. Doc. No. 19 (p. 2).

In sum, Mingo has provided no evidence that Defendant or NTA targeted him for drug testing on account of his race. Nor has he provided any statistical or other evidence that African American officers are selected for drug testing more frequently than white officers. Therefore, the Court finds that there is no genuine dispute as to any material fact related to Plaintiff's allegations of racial discrimination in connection with Defendant's drug testing program, and Defendant is entitled to summary judgment on those claims.

9

2. Hostile Work Environment

Plaintiff's second claim of racial discrimination is that he was subject to a racially hostile work environment. The first step in analyzing this claim is to determine the scope of conduct which may be properly considered as supporting evidence. Mooresville argues that any allegations of discrimination that occurred more than 180 days before the filing of Plaintiff's second EEOC Charge are not properly before this Court due to the statutory time limit imposed by Title VII. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004) ("discrete acts of discrimination 'are not actionable if time-barred, even when they are related to acts alleged in timely filed charges.'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002))). Were this only a claim for disparate treatment as Defendant argues, Defendant's assertion might have merit. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 n.5 (4th Cir. 2019). However, Mingo's racial discrimination allegations include a separate hostile work environment claim.[2]

---

[2] Defendant seeks to limit the scope of Mingo's racial discrimination claim to his challenge to the MPD's drug testing program. Doc. No. 17 (p. 13-21). Although it is (unhelpfully) limited to a single sentence in the Complaint, Plaintiff has alleged a broader claim that the MPD created a hostile work environment. The Court thus agrees with Plaintiff that his claims do not rise or fall based only on Plaintiff's allegations regarding the drug testing program. Viewed in the widest possible context, Plaintiff specifically alleged that he was subjected to a continuing hostile work environment in both his first and second EEOC Charges. Doc. Nos. 29-6 (p. 2), 29-10 (p. 2). Moreover, Plaintiff referenced both EEOC Charges in his Complaint and specifically noted that "Commanding Officers held racially biased views which found their way into the Plaintiff's work environment." Doc. No. 1 (p. 3); *see also Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) (noting that Title VII reflects "congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment." (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986))). Accordingly, while the Court again notes the importance of plaintiffs making clear and specific allegations in their Complaints, there can be no credible dispute that Defendant was not aware of Mingo's ongoing hostile work environment allegations.

Both the Fourth Circuit and the Supreme Court have explained that a hostile work environment "is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Agolli v. Office Depot, Inc.*, 548 F. App'x 871, 874 (4th Cir. 2013) (internal quotation marks omitted) (quoting *Morgan*, 536 U.S. at 117). As such, conduct occurring before the statutory period may be considered as long as it is part of a continuing pattern and at least one act falls within the statutory time period. *See Morgan*, 536 U.S. at 118.

Here, Mingo has alleged such a pattern of continuing unlawful conduct. For example, he marked the "Continuing Action" box on each of his EEOC Charges. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 511 (4th Cir. 2005) (considering Plaintiff's failure to check the continuing action box as evidence that Plaintiff's allegations concerned discrete acts of discrimination rather than long-term harassment); *Muir v. Winston-Salem State Univ.*, No. 1:11–cv–282., 2012 WL 683359, at *8 n.10 (M.D.N.C. March 2, 2012) ("A claimant's failure to check the 'continuing action' box in the EEOC charge—while not dispositive—may be probative in considering whether an initial charge encompasses a hostile work environment claim." (citing *Chacko*, 429 F.3d at 511)); *Bolds v. South Carolina Department of Mental Health*, No. 2:20-cv-01653, 2021 WL 1413324, at *6 (D.S.C. Feb. 11, 2021) ("[T]he distinguishing circumstance in this case is that Plaintiff checked the 'continuing action' box in his Charge, which is unique to hostile work environment claims." (citing *Muir*, 2012 WL 683359, at *8 n.10)). Moreover, as discussed below, the conduct allegedly constituting a hostile work environment spans multiple years. Therefore, the Court find that the proper scope of the hostile work environment claim includes conduct that occurred before the 180-day time period advocated for by the Defendant.

To demonstrate a racially hostile work environment, "a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on … race; (3) which is sufficiently severe or pervasive

11

to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). Analysis of whether a workplace is hostile and abusive, and therefore sufficiently severe and pervasive, requires a review of the "totality of the circumstances," including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The "ultimate inquiry is whether the conduct is so 'extreme' that it 'amount[s] to a change in the terms and conditions of employment.'" *McIver*, 42 F.4th at 408 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "[C]onduct directed at others is relevant if the plaintiff knew of the conduct." *Id.* (citing *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 317 (4th Cir. 2008)).

Viewing the facts generously in the light most favorable to Plaintiff in the context of summary judgment,[3] the Court finds that there may be evidence from which a jury could reasonably determine that the work environment at the MPD was sufficiently severe or pervasive as to alter the conditions of Mingo's employment. In December 2017, Plaintiff was directed to participate in a wreath-laying event celebrating confederate soldiers. Doc. No. 29-5. When Plaintiff expressed his reluctance to participate because of his family's history with slavery, he was formally investigated by one of his superior officers for potentially violating "white people rights." Doc. No. 29-5. In his first EEOC Charge, filed six months after this event, Mingo stated

---

[3] To be clear, the Court's willingness to allow this claim to proceed past summary judgment does not necessarily forecast that the Court will similarly conclude that Plaintiff has presented sufficient evidence to survive a motion for a judgment as a matter of law under Fed. R. Civ. P. 50. That decision must await a determination of the persuasiveness of the evidence at trial.

12

Case 5:22-cv-00032-KDB-SCR   Document 33   Filed 09/18/23   Page 12 of 18

that he had been subjected to discriminatory treatment on the basis of race throughout his employment. Doc. No. 29-6. Also, as part of his response to this Motion, Plaintiff has stated that fellow officers targeted him with racially disparaging remarks about African American citizens, such as referring to them as "thugs and hoodlums." Doc. No. 29-3 (pp. 4-5). Plaintiff alleges that such comments were repeatedly made in front of supervisors, who failed to act. Doc. No. 29-3 (pp. 4-6).

Moreover, Plaintiff was disciplined twice for conduct for which he says similarly situated white officers received no discipline. In November 2018, Mingo received a written reprimand for engaging in a verbal altercation at the MPD's firearms range. Doc. No. 29-7. One year earlier, when a similar incident occurred between an African American officer and a white officer, only the African American officer was disciplined. Doc. No. 29-21 (p. 8). Then, in January 2019, Mingo met with HR to discuss his concerns that he was subject to race-based harassment and discrimination in retaliation for filing his first EEOC Charge. Doc. No. 29-3. Less than two weeks later, Mingo was disciplined for his behavior in that meeting. His purportedly "objectionable" behavior included wearing his uniform and associated equipment, despite being directed to speak with HR by his supervisor while on duty, Doc 29-3 (pp. 6-7), standing in the doorway of the HR office, speaking aggressively with a "hard tone of voice," making constant eye contact with the HR representatives, and appearing visibly upset. Doc. Nos. 29-8 (p. 3), 23 (pp. 24-25). Mingo has alleged that a white officer, whom he has specifically named, was not disciplined for similar behavior. Doc. No. 29-3 (p. 7). In addition, although Plaintiff was investigated for expressing his discomfort participating in a ceremony concerning confederate soldiers, twelve other white officers were not disciplined for speaking with members of the media and making racially

13

derogatory statements about members of the MPD, including the Chief of Police. Doc. Nos. 29-3 (p. 4), 29-21 (p. 3).

Further, Mingo testified that he was aware that other African American officers were repeatedly subjected to racial epithets and asked whether they or their friends were members of a gang. Doc. No. 29-3 (p. 5). He was also aware of other African American officers, including one who came before this Court, *see McDowell v. City of Mooresville*, 5:21-cv-00155, 2023 WL 2352832, at *6 (W.D.N.C. Mar. 3, 2023), who were punished more severely than white officers who had engaged in similar conduct. Doc. Nos. 29-21 (pp. 2-4), 29-3 (pp. 3-10). Mingo's allegations do not appear to be mere conjecture. Plaintiff specifically alleges the names of the white officers, their particular misconduct, and details of the preferential treatment they received. Doc. No. 29-3 (pp. 3-10).[4]

In summary, the Court finds that, when viewing all the evidence in the light most favorable to Plaintiff, including all reasonable inferences, Plaintiff has met his burden of proffering sufficient evidence to avoid summary judgment on his claim that he was subject to a racially hostile work environment in violation of Title VII.

B. Retaliation

Title VII prohibits an employer from discriminating against an employee because he "has opposed any ... unlawful employment practice." 42 U.S.C. § 2000e–3(a). Mingo may prove such a violation "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp.*" *See Foster v. Univ. of Maryland-E.*

---

[4] The evidence provided so far by Mingo regarding disparate punishment appears to be based on the alleged personal knowledge of Javhon McDowell and Mingo himself. Plaintiff is forewarned that at trial the Court will require proof of an adequate foundation for personal knowledge of these events or other documentary/testimonial evidence proving their existence.

14

*Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Because Mingo has not offered direct or indirect evidence of retaliatory animus, he must proceed under the *McDonnell Douglas* framework.

The *McDonnell Douglas* framework requires Mingo to "first establish a prima facie case" of retaliation in violation of Title VII. *Foster*, 787 F.3d at 250. That means Mingo must prove that (1) he "engaged in a protected activity," (2) "that h[is] employer took an adverse employment action against h[im]," and (3) "that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleu Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)). Should Mingo satisfy this requirement, the burden then shifts to Mooresville to demonstrate that the contested conduct stemmed from legitimate, non-retaliatory reasoning. *See Foster*, 787 F.3d 250. The Plaintiff is then given a chance to show that his employer's proffered reasoning was merely "a pretext for discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Title VII recognizes two forms of protected activity. The first is activity "oppos[ing] any practice made an unlawful employment practice by this subchapter" and the second is activity where the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Mingo appears to have engaged in multiple instances of protected activity.

On January 18, 2019, Mingo spoke with two members of HR. He expressed concerns regarding the frequency with which he had been drug tested and asserted his belief that he was being selected with disproportionate frequency, in part, because he had filed an EEOC complaint. Doc. No. 23 (pp. 22-23). This constitutes protected activity because Mingo was opposing alleged retaliation that he believed he was experiencing as a consequence of filling his first EEOC charge.

Further, Mingo engaged in the second form of protected activity by filing his second EEOC Charge on July 8, 2019. Doc. No. 29-10.

Mingo has also provided sufficient evidence of adverse action. On the same day he spoke with HR, one of the participants in that meeting, Ms. Greer, filed a complaint with Chief Williams alleging that Mingo had exhibited inappropriate conduct during the meeting, including wearing his uniform and associated equipment, standing in the doorway of the HR office, speaking aggressively with a "hard tone of voice," making constant eye contract with the HR representatives (which the HR representatives interpreted as "glar[ing] and star[ing]"), and appearing visibly upset. Doc. Nos. 29-8 (p. 3), 23 (pp. 24-25). Eleven days later, Mingo received a written reprimand from his supervisor Major Henderson. Doc. Nos. 21, 29-8.

Not only was Mingo subject to a written reprimand, but that reprimand was then used to justify downgrading his performance review from "Exceeds Expectations" to "Meets Expectations." Doc. No. 29-10 (p. 2). His impacted performance review resulted in Mingo receiving a smaller pay raise than he otherwise would have been entitled to receive by virtue of his annual performance review. Doc. No. 29-10 (p. 2).

However, Mingo cannot meet the causation element of his prima facie case of retaliation. The causation element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[5]

---

[5] The parties disagree on whether the adverse employment action was close enough in time to the alleged retaliation to show causation. Mingo argues that he may show causation through temporal proximity, such as when "the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Roberts v. Glenn Industrial Group*, 998 F.3d 111, 126 (4th Cir. 2021) (citing *Price v. Thompson*, 380 F.3d 209, 213) (4th Cir. 2004)). However, the protected activity and retaliatory conduct must be close in time. *See Clark County*

Yet, Major Henderson testified that he was unaware of the subject matter of Mingo's meeting with HR and Mingo's previous EEOC Charge at the time of his investigation and when he issued the reprimand. Doc. No. 21 (p. 3). And, even when taking the facts in the light most favorable to Mingo, Mingo has provided no evidence to counter Major Henderson's testimony that the decision to issue a reprimand was not influenced by Mingo's previous EEOC Charge or his race.

Mingo testified that the written reprimand from January 2019 caused his performance review to drop from "Exceeds Expectations" to "Meets Expectations." Doc. Nos. 23 (p. 36), 29-10 (p. 2). However, Plaintiff has provided no concrete evidence that the reprimand was included in Mingo's performance review for the purpose of retaliation. In fact, Mingo testified that it was either Henderson or then-Captain Joseph Cooke who requested that the reprimand be included in the annual review, Doc. No. 23 (p. 26), and there is no evidence of any connection between their decision to do so and any of Mingo's protected activity. Therefore, Mingo is unable to show that his employer's adverse action (downgrading his annual review) had a causal connection to

---

*School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Months-long interim periods are generally insufficient to establish causation. *See, e.g., Roberts*, 998 F.3d at 127 (noting that courts within the Fourth Circuit have found lapses of three-to-four months "insufficient to infer a causation relationship without other evidence of a causal link."). That said, the Fourth Circuit has recognized that despite the passage of time, an employee may prove retaliation by showing that the employer engaged in adverse action "upon the employer's first opportunity to do so." *Templeton v. First Tennessee Bank, NA.*, 424 F. App'x. 249, 251 (4th Cir. 2011). Although the events at issue might be considered to be sufficiently proximate in time because the annual review was the first opportunity for the MPD to retaliate, the Court need not decide the issue because the fundamental failing of Mingo's retaliation claim is his inability to connect any adverse action to his protected activity.

Mingo's protected activity (his EEOC Charge and internal complaints). As such, summary judgment will be granted to Defendant on Plaintiff's retaliation claim.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED in part and DENIED in part as described above;** and

2. This case shall **proceed to trial on the merits on the remaining claim** in the absence of a voluntary resolution of the dispute among the parties. The trial will begin on November 20, 2023, at 9:30 a.m. in Courtroom, 200 W. Broad St., Statesville, NC 28677.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: September 17, 2023

Kenneth D. Bell
United States District Judge